**F.C. CYCLES INTERNATIONAL, INC.**

**v.**

**FILA SPORT, S.p.A.**

**Civil No. AMD–96–107.**

United States District Court,
D. Maryland,
at Baltimore.

Nov. 12, 1998.

Barry William Levine, Charles W. Saber, Charles S. Murray, Jr., Dickstein, Shapiro & Morin, Washington, DC, for plaintiff.

Paul M. Sandler, Freishtat & Sandler, Baltimore, MD, Mark E. Duckstein, Philip R. White, Jeffrey J. Greenbaum, Sills, Cummis, Radin, Tischman, Epstein & Gross, Harry I. Lewin, Mitchell C. Stein, Lewin & Laytin, New York, Lawrence H. Wechsler, Washington, DC, for defendant.

### MEMORANDUM AND ORDER

GAUVEY, United States Magistrate Judge.

Pending before the undersigned is Plaintiff's Motion to Compel Production of Allegedly Privileged Documents and Deposition Testimony.[1]

A hearing was held on this motion on Tuesday, October 27, 1998, and the Court invited additional submissions due on Wednesday, October 29, 1998, and Tuesday, November 3, 1998.

A review of the pretrial history of this case provides an important backdrop to the current discovery disputes and the Court's rulings thereon.

### Pretrial Scheduling

On May 15, 1996, pursuant to Fed.R.Civ.P. 16(b) and Local Rule 103.9, the Court entered a Scheduling Order, jointly proposed by the parties, to govern the pretrial management of this case. (Paper No. 20). That Order provided in part for the close of non-expert discovery on November 15, 1997, the designation of expert witnesses by both parties on December 15, 1997, the exchange of witness reports on March 15, 1998, a discovery deadline of May 15, 1998, the requests for admission on June 15, 1998, and filing of dispositive pretrial motions on April 15, 1998. The Order further provided that the schedule would not be changed except for "good cause."

By Order dated September 29, 1997, based on stipulation of the parties, all of the above dates were extended by 90 days. (Paper No. 74).[2]

As a result of a January 14, 1998 status conference, further changes were made in the Scheduling Order, most pertinently providing for the close of non-expert discovery on May 13, 1998; designation of expert witnesses on May 15, 1998; exchange of expert reports on July 24, 1998; a discovery deadline of September 8, 1998; request for admissions deadline of October 8, 1998; and dispositive pretrial motion deadline of December 7, 1998. The trial date of April 5, 1999 was set.[3] (Paper No. 100). At that status conference and consistently thereafter, the Court has stated that the dispositive pretrial motion deadline and trial date were fixed.

On May 26, 1998, Fila requested that the designation and exchange of expert witness reports be collapsed into a single, extended deadline of July 24, 1998. (Paper No. 115).

On July 21, 1998, both parties requested a further extension of the deadlines: the designation of expert witnesses and exchange of reports to August 24, 1998, discovery dead-

---

**1.** This version of the memorandum and order was edited by Judge Gauvey. The portions that were not submitted for publication relate to and were in answer to the following three motions and do not present any novel issues: (1) Plaintiff's Motion for Rule 37(b)(2) Sanctions; (2) Plaintiff's Motion to Strike Fila's Untimely Designation of Expert Witnesses; and (3) Defendant's Motion to Compel Production of Deposition Testimony, Related Documents and for Other Relief.

**2.** The close of non-expert discovery was extended to February 15, 1998, the designation of expert witnesses to March 15, 1998, the exchange of witness reports to June 15, 1998, the discovery deadline to August 15, 1998, the requests for admission deadline to September 15, 1998, and the dispositive pretrial motion deadline to November 15, 1998.

**3.** Plaintiff filed a request to convene a status call to discuss defendants' unilateral suspension of discovery, and to modify the schedule to set a trial date. (Paper No. 84). Defendants then filed a response agreeing to participate in the status conference, but asking the Court to take notice of plaintiff's improper behavior during the discovery process. (Paper No. 86).

At the conference, Fila requested an extension of 60 days for non-expert discovery in light of the location of many documents requested in foreign countries and many, of course, maintained only in a foreign language.

line to October 8, 1998, and requests for admissions deadline to October 15, 1998, with response to requests for admissions due November 9, 1998.

On September 22, 1998, Fila moved to substitute Paul Mark Sandler, Freishtat & Sandler, Jeffrey J. Greenbaum, Mark E. Duckstein and Philip R. White as its counsel in place of Lawrence H. Wechsler, S. Robert Sutton and Janis, Schuelke & Wechsler and Harley I. Lewin, Mitchell C. Stein, G. Roxanne Elings, Richard B. Verner and Lewin & Layton, P.C.

On October 5, 1998, three days before the expert discovery deadline, new counsel for Fila requested that the deadline for completion of expert discovery and the service of requests for admission be extended for 45 days, which F.C. Cycles vigorously opposed. By Order dated October 7, 1998, the undersigned extended the discovery deadline to October 22, 1998, the service of requests for admission to October 29, 1998, and the response to requests for admission to November 16, 1998, to afford a limited courtesy to new counsel without affecting the dispositive pretrial motion deadline or trial date.

· While both parties have requested modifications to the pretrial schedule, Fila has been responsible for more of the pretrial extensions and certainly, its October 5 request for an extension of the pretrial deadlines (which the Court granted in part) has resulted in an extraordinarily tight pretrial schedule, even before consideration of the multiple, additional discovery requests Fila has now made.

### Discovery Disputes

There have been a significant number of discovery motions filed. To date, the Court has granted in part all three motions filed by F.C. Cycles.[4] On the other hand, to date the Court has denied three of Fila's motions and granted in part only one of Fila's motions.[5]

### Plaintiff's Motion to Compel Production of Allegedly Privileged Documents and Deposition Testimony

The plaintiff requests that the Court compel the production of allegedly privileged documents listed on the defendant's privilege log as document Nos. 8, 26, 27, 28, 29 and any other withheld documents discussing or mentioning the value of F.C. Cycles' license, the possible use of the license as a leverage tool against Mr. Mordo or GMS in any way, or any link between F.C. Cycles' license and GMS, Fila USA or Fila Canada; that the Court compel the deposition testimony of Kenneth Tabler, Luigi Gregotti, and Stan Martindell concerning the contents of those communications and related subjects; and that the Court compel the production of any other documents and testimony the existence of which is revealed in either the written communications or the further deposition testimony of Tabler, Gregotti, or Martindell.

### Factual Background

Pursuant to its claim of improper termination of its license, F.C. Cycles issued document requests to Fila seeking all documents mentioning F.C. Cycles, its principal owner, Alex Mordo, or Gabriel A. Mordo & Sons Ltd. (GMS), a former distributor of Fila products in Canada of which Mr. Mordo is also a principal. Discovery was undertaken pursuant to a Confidentiality Stipulation and Protective Order signed on December 30, 1996 by Judge Andre M. Davis. The Order stated, in pertinent part, as follows:

12. It is expressly recognized that inadvertent production of privileged or arguably privileged matters shall not be

---

4. Plaintiff's motion to compel production of documents filed May 30, 1997, was granted in part and denied in part by Judge Davis' Order dated July 11, 1997. Plaintiff's motion to compel defendant to schedule depositions filed June 26, 1997, was granted in part and denied in part by Judge Davis' Order dated July 21, 1997. Plaintiff's motion to compel the production of license-related documents and witnesses from defendant filed October 31, 1997, was granted in part and denied in part by Orders dated February 12, 1998, and August 28, 1998.

5. Defendant's motion for Protective Order, to compel plaintiff to schedule depositions, and for sanctions filed July 14, 1997, defendant's motion for Protective Order filed July 15, 1997, was denied by Order dated September 3, 1997. Defendant's motion to compel and for Protective Order filed October 31, 1997, was granted in part and denied in part by Order dated February 12, 1998. Defendant's motion to compel filed December 3, 1997, was denied by Order dated February 12, 1998.

deemed to be either: (a) a general waiver of the Attorney-client privilege; or (b) a specific waiver of any such privilege with respect to documents being produced or the testimony given. Notice of any claim of privilege as to any document claimed to have been produced inadvertently shall be given within a reasonable period of time after discovery of the inadvertent production, and, on request by the producing party, all inadvertently produced materials as to which a claim of privilege is asserted and any copies thereof shall be returned promptly.

(Paper No. 140; plaintiff's reply memorandum, Ex. 1 at 5–6).

Fila responded to F.C. Cycles' requests and produced in excess of 64,000 pages of documents. Among these documents was a two page memorandum, dated July 27, 1995, authored by Ian MacNeil, the controller of Fila Canada, and addressed to Michael Giese, Senior Vice President and General Manager of Fila Canada.

The memorandum was a summary of recommendations made by Geoffrey Belsher, in-house General Counsel for Fila Canada, regarding a dispute that had arisen between Fila Canada and GMS. The memorandum stated as follows:

```
TO: M. GIESE
FROM: I. MacNEIL
RE: MORDO ACQUISITION
DATE: July 27, 1995
C.C.: G. SPAGLIARDI
 K. TABLER
 S. MARTINDELL
```

As you are aware, Ken Tabler and I met with Geoff Belsher to review the potential adjustments and/or offsets identified to-date from a legal standpoint, as well as a strategic standpoint.

Geoff's opinion was as follows:

(I) Adjustments that represent a revaluation of the amount paid at the closing date are not legally possible unless we can prove collusion or fraud. The fact that Ernst & Young attended re due diligence is not in our favour.

(ii) Adjustments to the commissions due Mordo for Spring 95 bookings for items "B" to "E" as set out in Exhibit One are solid legally

(iii) After that point and subject to his comments re collusion or fraud the balance of the adjustments we have identified are a poker game i.e. can we negotiate a further reduction in the commissions not of legal fees that results in a payment to Mordo that is less than the remaining balance of the commissions (about $470,000)

(iv) Prior to our meeting with Mordo, Geoff recommends that we file claims against the Edmonton and Toronto boutiques. Notwithstanding that we may extricate some settlement, Geoff feels that we must put pressure on these individuals to see if they will crumble and admit collusion with Mordo. He feels that the individuals will contact Mordo and make their own threats to disclose any such arrangements to us rather than spend money to defend themselves.

(v) In a personal meeting Mordo should be advised that:

(a) No commissions will be pain until we have investigated the loss in value of the assets we acquired and that such investigation will include the personal examination of third parties including their books and records.

(b) All [INDECIPHERABLE] as noted to-date should be utilized in our salvo at Mordo. While some are legally questionable they are not morally questionable.

(c) If Mordo wishes to sue in the meantime he is free to do so.

(vi) The Fila bike license should be used as a negotiating tool. This might mean the threat to cancel or a fixed term might be provided to ease the adjustment/offset negotiations. Ken will follow up with Italy to determine the value of this license to Mordo.

(vii) Despite our feelings re the quality of Ernst & Young work a fight with our accountants might only confuse the courts as who we felt was at fault.

(viii) Geoff is very concerned about our verbal approach with Mordo re a libel

suit. Accordingly, he would like to run over what is and is not okay to say prior to the meeting.

Ken will discuss the outcome of our meetings and discussions with Georgio and Stan.

(Paper No. 140; memorandum in support of plaintiff's motion, Ex. A).

On July 29, 1997, counsel for F.C. Cycles deposed Robert Liewald, a Fila executive, and had the above document marked as a deposition exhibit. (Paper No. 140; plaintiff's reply memorandum, Ex. 2 at 118–119). Leiwald read the memorandum and was asked several questions concerning the parties mentioned in the document and the subject matter of the document. Leiwald stated that he had no knowledge of the document or of the parties there mentioned. Defense counsel did not object to the document's marking as an exhibit or make any claim of privilege regarding the document.

Eleven months later, on June 18, 1998, counsel for the plaintiff deposed Ken Tabler, another Fila executive, and showed him the July 27, 1995 memorandum, asked him numerous questions about it and the underlying meeting, and elicited testimony concerning all those subjects. (Paper No. 140; memorandum in support of plaintiff's motion, Ex. B at 114–162). At the beginning of this inquiry the following exchange took place:

Q [by plaintiff's counsel]: Reflecting back to this meeting, were the discussion [sic] of potential offsets that were deemed improper unless Fila could prove collusion or fraud?

A [by Tabler]: I'm not sure what I can discuss at that meeting since it was with counsel.

[Defendant's counsel]: You can answer that question. This memorandum's been furnished. Answer the question.

(Paper No. 140; memorandum in support of plaintiff's motion, Ex. B at pg. 124).

The deposition continued with the plaintiff's counsel examining Mr. Tabler on the memorandum and the meeting it memorialized. Defendant's counsel raised several objections; however, none of the objections implicated the attorney client privilege as to the underlying meeting or the document. The defendant's counsel did object on the ground of privilege, however, when plaintiff's counsel questioned Mr. Tabler concerning communications between himself and Mr. Martindell, Fila USA's in-house General Counsel. Specifically, plaintiff's counsel sought testimony concerning communications relating to item (vi) of the memorandum; the use of the Fila bike license as a negotiating tool.

Shortly thereafter, the following exchange took place:

[Plaintiff's counsel to Defendant's counsel]: Counsel, I think we have subject matter waiver on this point. [Tabler's] discussed—not only do we have this memorandum, we now have Mr. Tabler's recount of his discussions with Mr. Belsher whose been identified as Fila's counsel—

[Defendant's counsel]: I think you have waiver as to that meeting. I don't think you have waiver through this case.

[Plaintiff's counsel]: I only mean on the subject of the bicycle license.

[Defendant's counsel]: I understand what you mean.... I think you have—you have waiver as to the contents of what took place at that meeting.

[Plaintiff's counsel]: [F]or the record, at the very least, I think we have subject matter waiver on the majority, if not all of what's discussed in this memo, but in particular at this moment about the bicycle license and the discussion of F.C. Cycles' bicycle license. Such a waiver would make discoverable any discussions this witness had with Mr. Martindell or any other counsel.

(Paper No. 140; memorandum in support of plaintiff's motion, Ex. B at 154–155).

On August 5, 1998, the plaintiff's counsel deposed Luigi Gregotti, Fila's Manager of Licensing, and again produced the aforementioned memorandum. (Paper No. 140; memorandum in support of plaintiff's motion, Ex. C at 1214). Mr. Gregotti denied knowledge of the memorandum and plaintiff's counsel began inquiring into communications Mr. Gregotti had with Mr. Martindell concerning the issues raised in the memorandum that took place in July and August 1995. Plain-

tiff's counsel specifically attempted to elicit information related to documents identified on the defendant's privilege log pertaining to the bicycle license issue raised in the July 27, 1995 memorandum. Upon advice of counsel, Mr. Gregotti invoked the attorney client privilege and refused to answer. Counsel discussed the possibility that the privilege was waived, however, Mr. Gregotti continued to follow the advice of counsel and refused to answer. (Paper No. 140; memorandum in support of plaintiff's motion, Ex. C at 1215–1233).

On September 21, 1998 the plaintiff filed the instant motion to compel production of five documents listed on the defendant's privilege log: Document Nos. 8, 26, 27, 28, 29. (Paper No. 140; memorandum in support of plaintiff's motion, Ex. G at 2–4). The subject matter of all the sought after documents are described in the privilege log as advice or information concerning the "Mordo license agreement for bicycles." (*Ibid.*). At the Court's request, these documents have been submitted for *in camera* review.[6] The plaintiff also seeks to compel deposition testimony related to the above identified documents.

### Analysis

Plaintiff makes three arguments for its entitlement to these documents. F.C. Cycles asserts that the July 27, 1995 memorandum is not privileged because it provides business rather than legal advice. Alternatively, the plaintiff argues that even if the document is considered a privileged communication, the defendant has voluntarily waived the privilege. Finally, the plaintiff asserts that the communication was in furtherance of a tort and thus cannot be protected by the attorney client privilege. If that memorandum is not privileged under any of these theories, F.C. Cycles argues, neither are the follow-up communications.

■■■ The determination of whether specific communications are afforded protection from scrutiny must be made by balancing the importance of encouraging frank communication between a lawyer and her client and the "truth seeking mission of the legal process." *United States v. Aramony,* 88 F.3d 1369,

1389 (4th Cir.1996). Thus, the attorney client privilege must be strictly construed to accommodate these two competing interests. *See United States v. Tedder,* 801 F.2d 1437, 1441 (4th Cir.1986), *cert. denied,* 480 U.S. 938, 107 S.Ct. 1585, 94 L.Ed.2d 775 (1987) and cases there cited.

■■ It is the burden of the party asserting the privilege to demonstrate that

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (I) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client. *United States v. Tedder,* 801 F.2d 1437, 1442 (4th Cir.1986) (*quoting United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950)), *cert. denied,* 480 U.S. 938, 107 S.Ct. 1585, 94 L.Ed.2d 775 (1987).

*In re Allen,* 106 F.3d 582, 600 (4th Cir.1997), *cert. denied sub nom, McGraw v. Better Government Bureau, Inc.,* —— U.S. ——, 118 S.Ct. 689, 139 L.Ed.2d 635 (1998).

With these general principles in mind, the Court will address each theory of discoverability.

**A. The Purpose of the Document: Legal Versus Business Advice**

■■■ The plaintiff asserts that the documents in question do not qualify for protection under the cloak of attorney client privilege because the subject matter of the July 27 memorandum relates to business and not legal activities and because a non-lawyer was identified as the party that would procure certain information. Communications between corporate counsel and company per-

---

**6.** Document Nos. 8 and 29 are the same.

sonnel are privileged so long as the information is relayed for the purpose of obtaining legal advice. *Upjohn v. United States,* 449 U.S. 383, 394–395, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The communications retain their privileged status if the information is relayed from a non-lawyer employee or officer to other employees or officers of the corporation on a need to know basis. *Andritz Sprout–Bauer, Inc. v. Beazer East, Inc.,* 174 F.R.D. 609, 633 (M.D.Pa.1997); *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 518 (D.Conn.), *appeal dismissed,* 534 F.2d 1031, 1032 (2d Cir.1976). Only when the communications are relayed to those who do not need the information to carry out their work or make effective decisions on the part of the company is the privilege lost. *In re Grand Jury,* 758 F.Supp. 1411, 1412 (D.Colo.1991); *Andritz Sprout–Bauer, Inc.,* 174 F.R.D. at 633.

■ It is the content of the communication that determines whether the privilege applies. *N.L.R.B. v. Harvey,* 349 F.2d 900, 905–906 (4th Cir.1965). What would otherwise be routine, non-privileged communications between corporate officers or employees transacting the general business of the company do not attain privileged status solely because in-house or outside counsel is "copied in" on correspondence or memoranda. *United States Postal Service v. Phelps Dodge Refining Corp.,* 852 F.Supp. 156, 163–164 (E.D.N.Y.1994). Accordingly, if privilege protects the memorandum at issue it is not because it is copied to Mr. Martindell, General Counsel for Fila, U.S.A., but because it represents the legal advice of Mr. Geoffrey Belsher, in-house counsel for Fila Canada.

The July 27, 1995 memorandum relayed a summary of the advice given to two corporate officials, by in-house counsel, to other corporate officials. The memorandum plainly states that the purpose of the meeting was to garner legal advice (as well as "strategic" advice). Moreover, the memorandum is replete with references to legal possibilities (item (I)), adjustments being "solid legally" (item (ii)), the legal concepts of "collusion and

fraud" (item (iii)), whether a strategy is "legally questionable" (item (v)), legal strategy relating to suing Fila's accounting firm (item (vii)), and libel (item (viii)).

■ At the motions hearing plaintiff's counsel advanced a theory that if the Court were to generally find the memorandum at issue legal advice and thus privileged, it should examine each subparagraph to determine if the specific information contained therein was business rather than legal advice. Specifically, the plaintiff urges the Court to find that paragraph (vi) is not legal advice and, thus, not privileged. While legal advice provided in the context of business negotiations is protected under the attorney client privilege, business information provided in the context of business negotiations does not acquire protection under the privilege merely because it has been provided by an attorney. *SCM Corp. v. Xerox Corp.,* 70 F.R.D. at 517. *See also, In re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1036–38 (2d Cir.1984); *Hardy v. New York News, Inc.,* 114 F.R.D. 633, 643–44 (S.D.N.Y. 1987).

■ Generally, the plain language of the memorandum indicates that Mr. Belsher, General Counsel for Fila Canada, was giving an opinion as to options for dealing with a legal dispute, between GMS and Fila Canada. Paragraph (vi), however, does not appear to be legal advice; it simply requests information relating to the value of a bicycle license, apparently as part of formulating Fila's negotiating strategy. There is no indication from the face of the memorandum, from deposition testimony, or from subsequent pleadings that this information was requested or needed by the attorney to render further legal advice. Rather, the information would be useful in the business negotiations with Mr. Mordo regarding a separate business dealing. Accordingly, the attorney client privilege does not attach to the July 27, 1995 memorandum with respect to paragraph (vi).[7]

---

7. Because of this ruling it is not necessary to reach the plaintiff's assertion that because the task of information gathering was assigned to a non-lawyer the privilege did not attach. The Court notes, however, that, as previously discussed, it is the subject matter of the communication that determines a documents character and not the individual assigned to a specific task.

Because of the above finding it is necessary to review the requested documents to determine if they too implicate business, not legal advice and/or relate to item (vi) and thus are not privileged.

*Document Nos. 8 and 29*

Documents 8 and 29 are the same document. This communication was faxed on July 27, 1995 by Mr. Martindell, general in-house counsel for Fila U.S.A. to Franco Maula, Esquire, counsel for Fila Sport, S.p.A. Following in-camera review it is evident that the first paragraph of this document is privileged and therefore will not be discussed herein. Paragraphs two and three, however, relate directly to the "status of the bicycle license" and "negotiations with Mordo" and do not impart or request legal advice. Thus, paragraphs two and three are discoverable.[8]

*Document No. 28*

Document No. 28 is a fax communication, dated August 2, 1995, between Messrs. Gregotti and Martindell and appears to be a response to the July 27, 1995 fax discussed above. The first paragraph of this document plainly references the bicycle license. Paragraphs two and three appear to answer Martindell's request for information concerning the "status of the bicycle license." This is further substantiated by Martindell's faxed response discussed below.

*Document No. 26*

This August 2, 1995 fax from Mr. Martindell to Mr. Gregotti thanks Gregotti for the above discussed fax "concerning Mordo's license agreement" explaining that the received information "may be helpful in our negotiations with Mordo." As explained above, this, too, relates to item (vi) and involves business negotiations and not legal advice.

*Document No. 27*

This document is a follow-up fax from Martindell to Gregotti on August 2, 1995 requesting additional information concerning Mordo's bicycle licensing agreement that Martindell neglected to request in the above discussed August 2, 1995 fax.

Therefore, pursuant to the previous discussion the Court finds that Document Nos. 26, 27, and 28 are discoverable in their entirety. Paragraph one of Documents 8 and 29 (which are the same document) is privileged and must be redacted prior to disclosure.

## B. Disclosure of the July 27 Memorandum Waived the Privilege

F.C. Cycles also asserts that even if the memorandum was privileged any protection arising therefrom was waived by the "voluntary" disclosure of the document and, the waiver extends to all other communications relating to the same subject matter. The defendant does not dispute that the memorandum was disclosed. Rather, Fila argues that any waiver that occurred was "inadvertent" and, does not extend to any other document. Thus, it is the scope of the waiver that must be determined by the Court. Since the Court has determined that paragraph (vi) was not privileged (but the rest is), the Court must determine the effect of the production of the memorandum on other documents (or testimony) relating to the same subject matter.

▆▆▆ It is well understood that "[a]ny disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege." *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982). *See also Sheet Metal Workers International Assoc. v. Sweeney*, 29 F.3d 120, 125 (4th Cir.1994); *United States v. Oloyede*, 982 F.2d 133, 140 (4th Cir.1992). Intentional disclosure waives the privilege not only to the disclosed communication, but also to all "other communications relating to the same subject matter." *Jones*, 696 F.2d

See United States Postal Service v. Phelps Dodge Refining Corp., 852 F.Supp. 156, 163–164 (E.D.N.Y.1994); Stratagem Development Corp. v. Heron International, 153 F.R.D. 535, 543 (S.D.N.Y.1994).

**8.** See United States v. Under Seal, 33 F.3d 342, 344 (4th Cir.1994) (cases remanded with instructions that certain allegedly privileged documents be disclosed but that the portions of the documents that represent work product be redacted). See also United States v. Guay, 108 F.3d 545, 553 (4th Cir.1997) (case remanded with instructions that district court redact customs document and disclose redacted document to defendants).

at 1072. *See also Hawkins v. Stables,* 148 F.3d 379, 384 n. 4 (4th Cir.1998); *Sheet Metal Workers,* 29 F.3d at 125.

Consequently, should this Court find that the July 27, 1995 memorandum was intentionally disclosed the privilege that attached to it and to all other communications relating to the subject matter contained therein is waived. This determination requires that the conduct of the disclosing party be examined objectively for indicia of intent. That is, the Court must look through the assertion of the defendant that the disclosure was inadvertent to determine if its conduct reveals otherwise and if privilege was waived by implication.

Alternatively, should this Court determine that the document was inadvertently disclosed, then related communications may retain the protection of privilege. There is considerable evidence in the record before this Court, however, that the July 27, 1995 memorandum was not inadvertently disclosed, as claimed by the defendant.

### 1. *Waiver by Implication*

 The defendant asserts that "[c]entral to a court's determination of whether a waiver occurred and the scope of the waiver is the party's *intent* to maintain the confidentiality of the privileged material." (Paper No. 140; defendant's motion in opposition at 9). As compelling as this argument sounds, it is not an accurate statement of the law. Rather, as explained in *Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1162 (D.S.C.1974) (emphasis added),

> [a] privileged person would seldom be found to waive, if his intention not to abandon could alone control the situation. There is always also *the objective consideration* that when *his conduct* touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not.

Thus, it is the defendant's conduct that is examined to determine if it waived the privilege that attached to the July 27, 1995 memorandum and not its assertions concerning intent. *See Hawkins,* 148 F.3d at 384 n. 4 (stating that privilege can be waived either expressly or through conduct); *In re Grand Jury Proceedings,* 727 F.2d 1352, 1358 (4th Cir.1984) (holding that confidentiality was not intended in instances where those asserting the privilege provided the information to their attorney for the purpose of preparing a prospectus which was to be published to others, regardless of their assertions).

For example, in *Sheet Metal Workers,* 29 F.3d 120, an individual sought to quash subpoenas and disqualify his opponent's attorney by asserting a claim of joint defense attorney client privilege. In support of this theory, it was claimed that a certain document provided to an attorney and an Assistant United States Attorney, and conversations relating thereto, were protected by the attorney client privilege. Thus, the individual asserting the privilege claimed to have had an attorney client privilege with the attorney to whom he gave the subpoenaed documents and therefore had an expectation of privacy in the documents, even after turning them over to the Assistant United States Attorney, and in his conversations related thereto.

The Fourth Circuit rejected this assertion, however, after examining the proponent's conduct and noted that

> certain uncontradicted facts support the refusal of the district court to credit Sweeney's asserted belief that a privilege was intended. Sweeney is bound to have known that the memoranda would be useful to the Fund in civil suits that Sweeney knew ... were contemplated. Sweeney also knew of the on going grand jury investigation. He is bound to have known of the usefulness of the memoranda to the AUSA in the conduct of that investigation. The assertion of the claim of privilege for information turned over to the other side ... knowing its damning effect, is simply straining too far.

*Id.* at 125

Likewise, it is straining too far to credit the defendant's assertion of unintentional disclosure under the facts here presented. The July 27, 1995 memorandum was marked as an exhibit at Mr. Liewald's deposition on July 29, 1997. At that time the parties had entered into a confidentiality agreement that provided a remedy for inadvertent disclosure.

Counsel did not object to the use of the document at the July 29, 1997 deposition, did not give counsel notice, pursuant to its confidentiality agreement, that the memorandum was "produced inadvertently ... within a reasonable period of time after discovery of the inadvertent production," or seek return of the document. (Paper 140; plaintiff's reply memorandum, Ex. 1 at 5).

Moreover, eleven months later the defendant was again put on notice of the memorandum's disclosure. At Mr. Tabler's deposition, almost immediately after the memorandum was presented, Mr. Tabler, the deponent, questioned whether or not the document and the meeting it memorialized were privileged. His counsel expressly stated that the document had been produced and, therefore, the witness was free to discuss the meeting and the contents of the memorandum. (Paper No. 140; memorandum in support of plaintiff's motion, Ex. B at 124). Throughout this discussion, counsel did not assert the privilege as it related to this document or the underlying meeting. It was not until opposing counsel questioned Mr. Tabler about subsequent communications that related to the July 27, 1995 memorandum that an objection was raised and even then it was raised only to the subsequent communications and not to the document itself.

In sum, there were never any efforts to retrieve the document and privilege was not asserted as to the document until the defendant filed a memorandum in opposition to the instant motion in September 1998. The defendant failed to take advantage of the available confidentiality stipulation which would have allowed it to completely pull back the document. The defendant's "Johnny come lately" assertion of inadvertence is simply not enough to convince this Court that it intended to maintain the memorandum's privilege.

The effect of such a disclosure was recently addressed in *Hawkins,* 148 F.3d at 384 n. 4 where privilege was asserted over alleged conversations between attorney and client concerning a wire tap. The plaintiff in the case brought an action against his ex-wife asserting that she had disclosed information obtained through an illegal wiretap. At a deposition the ex-wife was questioned concerning conversations she had with her attorney concerning the alleged wire tap. No objections were raised to this line of questioning on any grounds and the ex-wife, "in answering the question as she did ... waived her privilege...." *Id.* at 384. Further, the court noted that the ex-wife did not raise the issue of privilege until her attorney was called to impeach her trial testimony.

While the *Hawkins* court held that there were numerous errors at the trial level that required reversal and remand, Judge Williams, writing for the Fourth Circuit, explained that

> [e]ven if [the ex-wife] could produce sufficient evidence to convince the district court on remand that she and [her attorney] had a confidential conversation regarding the phone tap, the attorney-client privilege would not apply *because her testimony during deposition and trial waived it....* [This] implied waiver occurr[ed] when the party claiming privilege ... made *any* disclosure of a confidential communication to *any* individual who is not embraced by the privilege.... Such a disclosure vitiates the confidentiality that constitutes the essence of the attorney-client privilege. Furthermore, such a disclosure not only waives the privilege as to the specific information revealed, *but also waives the privilege as to the subject matter of the disclosure.*

148 F.3d at 384 n. 4 (emphasis added) (citations omitted).

The situation at bar is strikingly similar. Extensive testimony was given by Tabler at his deposition concerning the subject matter of the memorandum and the underlying meeting. No objection was raised and no attempt was made to preserve the confidentiality of the document. Thus, the defendant's conduct surrounding the disclosure of the July 27, 1995 memorandum plainly indicates that privilege was impliedly waived not only to the document, but also to its entire subject matter.

### 2. *Inadvertent Waiver*

■ The defendant urges this Court to analyze the disclosure of the memorandum

under a five factor test used by numerous courts to determine whether the production of a particular document was inadvertent. Ordinarily, the cases on inadvertence focus on the fate of a particular document released in a document production. Typically, a privileged document is produced during discovery and the producer of the document seeks its return and to limit its use throughout the litigation. *See e.g. In Re Grand Jury Investigation*, 142 F.R.D. 276 (M.D.N.C.1992); *F.D.I.C. v. Marine Midland Realty Credit Corp.*, 138 F.R.D. 479 (E.D.Va.1991); *Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.*, 116 F.R.D. 46 (M.D.N.C.1987); *Liggett Group, Inc. v. Brown & Williamson Tobacco Corp.*, 116 F.R.D. 205 (M.D.N.C.1986).

In the instant case, however, the defendant seeks neither the return of the document nor to limit its use during the litigation. Fila admits that the document was disclosed, that it had an opportunity to pull it back under the confidentiality agreement but that it failed to do so, and that the plaintiff has unfettered use the document during the balance of the litigation. Fila resorts to the inadvertent waiver argument in an attempt to preclude the plaintiff from discovering additional documents that relate to the subject matter of the memorandum in question.

As discussed in the previous section, the undersigned finds that the defendant impliedly waived the privilege that attached to the document and, therefore, following Fourth Circuit precedent, privilege was also waived as to the subject matter of the document. While it is unnecessary, therefore, for this Court to reach this assertion it does so because the result is unchanged and the defendant's assertion fatally flawed.

Assuming *arguendo*, that the production was not waived by implication but produced by inadvertence, a close analysis of the facts here, in light of the governing case law, compels the conclusion that the privileged nature of the produced document is lost and waiver is not limited to the particular document (or the meeting it memorialized) but to all communications relating to the subject matter.

A considerable body of case law has developed on the effect of disclosure of allegedly privileged documents in the course of document production. While some courts have found that the disclosure of allegedly privileged documents in the course of a document production is essentially "voluntary" and once confidentiality is lost, it cannot be restored,[9] others take a flexible, middle ground approach and apply "a 'balancing test' that requires the court to make a case-by-case determination of waiver based upon several factors, including the diligence the party claiming the privilege exercised in seeking to maintain the confidentiality of the documents" (*In re Grand Jury Investigation*, 142 F.R.D. at 278); and still other courts follow a forgiving approach that holds that inadvertent disclosure never waives the privilege because waiver requires an intentional and knowing relinquishment.[10]

---

9. *See* 8 Wigmore, Evidence §§ 2325–2326, at 633–634 (McNaughton rev.1961). *See also, e.g.,* *O'Leary v. Purcell Co., Inc.*, 108 F.R.D. 641, 646 (M.D.N.C.1985) (voluntary production of a document during a Rule 34 procedure waives the attorney-client privilege); *Underwater Storage Inc. v. United States Rubber Co.*, 314 F.Supp. 546, 549 (D.D.C.1970) ("Once the document was produced for inspection, it entered the public domain"); *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1162 (D.S.C.1974) (same), *aff'd,* 540 F.2d 1215 (4th Cir.1976); *Rockland Industries, Inc. v. Frank Kasmir Assoc.*, 470 F.Supp. 1176, 1181 (N.D.Tex.1979) (same); *W.R. Grace & Co. v. Pullman, Inc.*, 446 F.Supp. 771, 775 (W.D.Ok.1976) ("Notwithstanding the apparently voluminous amount of discovery involved, [the disclosing party] could have taken necessary steps to remove purportedly privileged documents prior to permitting discovery of same.").

10. See, e.g., *Transamerica Computer v. I.B.M.*, 573 F.2d 646, 653 (9th Cir.1978) (Kennedy, J., concurring); *Mendenhall v. Barber–Greene Co.*, 531 F.Supp. 951, 954–55 (N.D.Ill.1982) ("If we are serious about the attorney client privilege and its relation to the client's welfare, we should require more than such negligence by counsel before the client can be deemed to have given up the privilege"); *Kansas–Nebraska Natural Gas Co. v. Marathon Oil Co.*, 109 F.R.D. 12, 21 (D.Neb.1983); *IBM Corp. v. Sperry Rand Corp.*, 44 F.R.D. 10, 13 (D.Del.1968); *Connecticut Mutual Life Ins. Co. v. Shields*, 18 F.R.D. 448, 451 (S.D.N.Y.1955) ("Only the client can waive this privilege and, to support a finding of waiver, there must be evidence that he intended to waive it").

The defendant asserts that the United States Court of Appeals for the Fourth Circuit has adopted the middle-ground approach. The Court has not expressly addressed this issue. Of late, however, numerous district courts in this circuit have embraced the balancing test, both in document production situations and otherwise. *See, e.g., McCafferty's, Inc. v. Bank of Glen Burnie,* 179 F.R.D. 163 (D.Md.1998); *In Re Grand Jury Investigation,* 142 F.R.D. 276; *F.D.I.C. v. Marine Midland Realty Credit Corp.,* 138 F.R.D. 479; *Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.,* 116 F.R.D. 46; *Liggett Group, Inc. v. Brown & Williamson Tobacco Corp.,* 116 F.R.D. 205. As support for this position the district courts often cite *In re Grand Jury Proceedings,* 727 F.2d 1352 (4th Cir.1984).

In *In re Grand Jury Proceedings,* 727 F.2d 1352, the Court was asked to issue a writ of mandamus requiring the reversal of the district court's order directing an attorney to testify concerning conversations between the attorney, his client, and his client's business associates. In making this determination the Court stressed that it does not favor the protections afforded by the privilege and that the privilege is to be " 'strictly confined within the narrowest possible limits.' " *Id.* at 1358. Confidentiality could be lost " 'even if the disclosure is inadvertent' such as in some circumstances 'eavesdroppers,' and again, where if the privileged communication consisted of 'privileged documents,' the party did not 'take reasonable steps to insure and maintain [their] confidentiality.' " *Id.* at 1356, *quoting Suburban Sew 'N Sweep, Inc. v. Swiss–Bernina, Inc.,* 91 F.R.D. 254, 258–259 (N.D.Ill.1981). Moreover, the Court observed that "[i]t is not asking too much to insist that if a client wishes to preserve the privilege under such circumstances, he must take some affirmative action to preserve confidentiality, ... [t]aking or failing to take precautions may be considered as bearing on intent" to preserve confidentiality. *Id.* at 1356.

Based in good measure on this language the district courts have determined that the Fourth Circuit favors the balancing ap-

proach. This Court notes, however, that in *N.L.R.B. v. Harvey,* 349 F.2d at 907, the court stated that the attorney client privilege "ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." Subsequently, in *Duplan Corp.,* 397 F.Supp. at 1163, the court interpreted *Harvey* as follows: "To the extent that [the cases cited by the plaintiff] require evidence of specific intent to waive the privilege, they are inconsistent with the Fourth Circuit's mandate in *Harvey, supra,* which is binding on this district court." Additionally, the recent cases discussed in the previous section, *Hawkins* and *Sheet Metal Workers* also favor the "strict" or "Wigmore" approach. *See supra* footnote 8.

Thus, it is not at all clear that the Fourth Circuit has adopted the balancing test. *See United States v. Tedder,* 801 F.2d 1437, 1441 (4th Cir.1986) ("we continue to treat *Harvey* as viable"). Under *Hawkins, Sheet Metal Workers, Duplan,* and *Harvey* it appears that there is more support for the theory that the Fourth Circuit favors the "strict" or "Wigmore" approach of full waiver upon disclosure—whether inadvertent, voluntary, or implied. *See supra* footnote 8.

Even assuming *arguendo,* that the Fourth Circuit does favor the intermediate approach, the outcome here is unchanged. Under the intermediate approach, "inadvertent disclosure in a document production can be deemed to evidence an abandonment of the requisite intent to maintain confidentiality, and thereby waive the attorney-client privilege under certain circumstances." In *In re Grand Jury Investigation,* 142 F.R.D. at 278–79, the court identified the following factors which should be considered in determining whether the circumstances underlying an inadvertent disclosure of attorney-client materials would vitiate the required intent to maintain confidentiality: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay in measures taken to rectify the disclosure; and (5) overriding interests in justice. *Accord Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.,* 116 F.R.D. 46, 50

(M.D.N.C.1987) and cases cited therein; *F.D.I.C. v. Marine Midland Realty Credit Corp.*, 138 F.R.D. 479, 482 (E.D.Va.1991) and cases cited therein.

While there is no doubt that the document in question was disclosed, application of the above factors to the facts illustrates that even under "inadvertence" analysis, subject matter waiver occurred under the present facts.

### a. The Reasonableness of the Precautions Taken to Prevent Inadvertent Disclosure

The defendant asserts that it engaged in a careful and systematic approach to document review for the express purpose of minimizing inadvertent disclosure. (Paper No. 140, defendant's motion in opposition at 7). Files containing potentially responsive documents were located and amassed for possible disclosure. The documents were reviewed by an attorney or a senior paralegal. Documents originally reviewed by a paralegal and identified as responsive were then subjected to a privilege review conducted by an attorney. If the initial review was conducted by an attorney, the same attorney simultaneously conducted a privilege review. All privileged documents were identified on a privilege log and all nonprivileged documents were disclosed to the plaintiff.

The Court must determine if the above precautions were objectively reasonable to avoid inadvertent disclosure. Some of the circumstances that courts often look to in making this inquiry are the number of documents involved and the time constraints the producing party was under. *See F.D.I.C. v. Marine Midland Realty Credit Corp.*, 138 F.R.D. 479, 482–483 (E.D.Va.1991).

*In Re Grand Jury Investigation*, 142 F.R.D. 276 (M.D.N.C.1992) is illustrative of reasonably adequate review procedures. There, over 22,000 documents were produced. Prior to production a review team examined approximate 300,000 documents. Once the review team determined that a document was producible, a review team made a second review of the documents to determine if any of them were privileged. Finally, a senior attorney made a final privilege review of a representative sample of the documents prior to their disclosure.

At the other end of the spectrum were the procedures employed in *Liggett Group, Inc. v. Brown & Williamson Tobacco Corp.*, 116 F.R.D. 205 (M.D.N.C.1986). There, a single box of documents, previously withheld from production, containing privileged documents were turned over to the opposing party. There was no evidence that the documents were reviewed after they were designated for disclosure, but prior to actual release. The court found these procedures lacking in care considering the small number of documents involved and the fact that the documents had previously been intentionally withheld from discovery.

Likewise, the efforts undertaken in *F.D.I.C. v. Marine Midland Realty Credit Corp.* were found lacking. While the actual number of documents were in dispute, between 15,000 and 50,000, the scale of production was considerable. The court noted that "[a]s the number of documents grows, so too must the level of effort increase to avoid an inadvertent disclosure. Failure to meet this level of effort invites an inference of waiver." 138 F.R.D. at 483. The court found that the use of a two person review team was inadequate under the circumstances of minimal time constraints and the number of documents reviewed and produced.

As above, in *Parkway Gallery Furniture, Inc.*, 116 F.R.D. 46, the review efforts were found lacking. Twelve thousand documents were produced under little or no time constraints. The producing party, however, deviated from its usual practice of reviewing the designated documents a second time after copying and prior to production. The court found that, in light of the number of documents produced and the lack of time pressure, the efforts employed were inadequate.

Aside from court imposed deadlines from time to time, here documents were produced over an extended period of time and in numerous installments. It is unquestionable that the quantity of documents produced (64,000 pages) was massive. The defendant, however, did not provide for a post designation review for the documents examined by

an attorney. The additional safeguard of reviewing the documents after copying, but before production, was also not employed. Thus, while the procedures employed were not totally lacking, considering the lack of severe time constraints and the number of documents produced the procedures were not adequate to avoid the inference of waiver.

b. The Number of Inadvertent Disclosures

While the number of documents inadvertently produced is a separate factor in the determination of waiver, it is highly probative of the reasonableness of the precautions taken by the producing party (*see supra* factor 1 discussion). In the instant case one three page document out of 64,000 pages of documents is at issue. While the procedures employed above were found to be less than adequate, production of a single three page document cannot be considered to be indicia of "lax, careless, and inadequate procedures." *Parkway Gallery Furniture*, 116 F.R.D. at 51. *See also In Re Grand Jury Investigation,* 142 F.R.D. at 281 (18 documents out of 300,000 was not suggestive of inadequate procedures). Thus, this factor weighs in favor of non-waiver.

c. The Extent of the Disclosure

It is undisputed that the extent of the disclosure of the memorandum in question was complete. Indeed, the defendant concedes that the document was completely disclosed and is not seeking to preserve the privileged nature of the memorandum. Thus, this factor compels a finding of waiver. Moreover, this document has "worked [its] way into the fabric of the case." *In re Grand Jury Investigation,* 142 F.R.D. at 281. As in *Marine Midland,* 138 F.R.D. at 480 and *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.,* 132 F.R.D. 204 (N.D.Ind.1990) this memorandum has been used in the depositions of several Fila executives. The consistent theme of F.C. Cycles' case has been that Fila terminated its franchise for improper reasons having little connection with its obligations under the agreement. This memorandum is now part of the warp and woof of F.C. Cycles' story.

d. Delay and Measures Taken to Rectify the Disclosure

The measures employed by the disclosing party, upon notice of an inadvertent disclosure, to either retrieve the document or ensure that additional privileged documents were not inadvertently disclosed, are analyzed by the courts in a very simplistic fashion, that is, the speed with which the measures are undertaken. *See e.g. In Re Grand Jury Investigation,* 142 F.R.D. at 281–282 (upon notice of inadvertent disclosure of one document the producing party immediately contacted opposing council and re-reviewed all disclosed documents).

For example, in *F.D.I.C. v. Marine Midland,* 138 F.R.D. 479, an inadvertently produced privileged document was used at a deposition against the producing party. The disclosing party's attorney immediately objected to the use of the document and took prompt steps to recover its possession. The court, however, did not find these measures adequate in light of the fact that there were no efforts made to ensure that other privileged documents were not inadvertently produced. *Id.* at 483.

As previously discussed, the July 27, 1995 memorandum was marked as an exhibit at Mr. Liewald's deposition on July 29, 1997 and no objection to its use was raised and no attempt was made to recover the document. Eleven months later at Tabler's deposition the defendant was again put on notice of the memorandum's disclosure, significant testimony was elicited, objections were not raised, and privilege was not asserted.

Additionally, the defendant failed to discuss this factor in its memorandum and thus, Fila has not explained its inactions. As to this factor it is clear that the defendant did not meet its burden in persuading this Court that this factor weighs against waiver.

e. Fundamental Fairness

Whether fundamental fairness weighs for or against waiver largely depends on the extent of the reliance the party has made on the document, in its case. *See e.g. Kansas City Power & Light Co. v. Pittsburg & Midway Coal Mining Co.,* 133 F.R.D. 171, 174

(D.Kan.1989) (fairness weighed in favor of finding non-waiver when the defendant failed to demonstrate that it had relied significantly on documents inadvertently disclosed by the plaintiff); *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.*, 132 F.R.D. 204, 209 (N.D.Ind.1990) (fairness required use by the plaintiff of an inadvertently produced letter since it had already been used in other discovery procedures including the depositions of defendant's employees); *Bud Antle, Inc. v. Grow–Tech, Inc.*, 131 F.R.D. 179 (N.D.Cal.1990) (fairness required a finding of waiver because the defendants had analyzed the inadvertently produced privileged document, had possibly disclosed it to experts, and had shown a strong reliance on it for purposes of their defense).

In the present case the plaintiff has significantly relied upon the disclosed document. It has been used in several depositions and addresses issues that are at the heart of its claim. Thus, the weight of this factor supports waiver.

With the exception of one of the above factors, all elements weigh-in for waiver.

### 3. *Scope of Waiver*

The remaining determination for the Court, therefore, is the effect of the waiver. Fila apparently took the view in its conduct in the depositions where the memorandum was displayed, that whatever waiver of privilege had occurred was limited to this document and the meeting it memorialized. That position is in error.

The few courts that have reached this question of the effect of unexcused, inadvertent waiver of particular documents on the discoverability of all documents on the same subject have done so tentatively and with mixed conclusions. *See* Laila Abou–Rahme, *et al., Procedural Issues*, 35 Am.Crim.L.Rev. 1061, 1094–1098 (Spring 1998). While the Fourth Circuit has not squarely addressed the issue of inadvertent waiver in document production its pronouncements in other waiver situations forecast its view here.

For example, in *Harvey*, 349 F.2d at 907 courts were admonished to strictly construe the attorney client privilege in light of its constraint on "the investigation of the truth." Following this stricture, the court in *Duplan Corporation*, 397 F.Supp. at 1162, stated that

A waiver of the privilege as to all communications ordinarily follows from the voluntary waiver even if made with limitations of one or more similar communications. Thus, if a client, through his attorney, voluntarily waives certain communications, but guarded with a specific written or oral assertion at the time of the waiver that it is not its intention to waive the privilege as to the remainder of all similar communications, the privilege, as to the remaining undisclosed communications, is nevertheless waived.

More recently, the court in *Sheet Metal Workers*, 29 F.3d at 125, found that the defendant's act of giving documents to his adverse party amounted to voluntary disclosure and waived any privilege that attached to the subject matter of the document. Relying heavily on *Sheet Metal Workers*, the court, in *Hawkins*, 148 F.3d at 384 n. 4, adhered to the strict construction of the attorney client privilege espoused earlier in *Harvey*, holding that waiver by implication waives privilege to the complete subject matter of the disclosed communication. *See also Santrade, Ltd. v. General Electric Co.*, 150 F.R.D. 539, 543 (E.D.N.C.1993) ("To the extent that [the plaintiff] has inadvertently or deliberately disclosed attorney client communications, it has waived attorney client privilege as to all communications on all subjects covered by these communications").

Moreover, this follows logically from a finding of unexcused inadvertence under the customary five factor test. As courts have suggested, the five factor test determines the "constructive" voluntariness or intentionality of the production from all the circumstances of its production. *F.D.I.C. v. Marine Midland*, 138 F.R.D. at 482 ("Inadvertent disclosures are, by definition, unintentional acts, *but disclosures may occur under circumstances of such extreme or gross negligence as to warrant deeming the act of disclosure intentional* ") (emphasis added). Thus, the conduct of the defendant, whether analyzed as an inadvertent or implied action requires that this Court find waiver as to the entire

subject matter of the document. *Jones,* 696 F.2d at 1072.

Whether the disclosure is analyzed under a voluntary or inadvertent model, it is highly apparent that there was little or no effort made by the defendant to maintain the confidentiality of this document. The Court has little choice, therefore, to infer from this lack of effort that the defendant had no real intent to keep the July 27, 1995 memorandum privileged. Therefore, this Court finds that the document was intentionally or voluntarily produced and consequently, the defendant has waived the entire subject matter of the memorandum. This ruling on inadvertence and scope of waiver provides an additional basis, of course, for the discoverability of the four withheld documents and testimony on these subjects.[11]

I find, therefore, that the defendant has failed to meet its burden of demonstrating that the attorney client privilege that attached to the July 27, 1995 memorandum was not voluntarily waived. *See In re Allen,* 106 F.3d at 600; *United States v. Jones,* 696 F.2d at 1072.

C. Plaintiff Failed to Meet Its Burden of Proving the Communications Were Made in Furtherance of a Tort

In light of the above finding, it is unnecessary for the Court to reach the question of whether the document in question loses its privilege because the sought after advice was made in the furtherance of a fraud or tort, but the Court will briefly do so.

■■■ A party may compel production of allegedly privileged communications upon a prima facie showing that the lawyer's advice was designed to serve his client in the commission of a fraud, crime or tort. *Duplan Corp.,* 540 F.2d at 1219; *Union Camp Corp. v. Lewis,* 385 F.2d 143, 144 (4th Cir. 1967). The plaintiff asserts that the July 27, 1995 memorandum is prima facie evidence of the defendant's tortious interference with F.C. Cycles' contract. The elements of tortious interference are: (1) the existence of a

contract between the plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with a contract; (4) breach of that contract by a third party; (5) resulting in damages to the plaintiff. *Fraidin v. Weitzman,* 93 Md. App. 168, 189, 611 A.2d 1046, 1057 (1992), *cert. denied,* 329 Md. 109, 617 A.2d 1055 (1993). Specifically, the plaintiff claims that Fila Canada and Fila U.S.A. intentionally sought to cause Fila Sport to breach its contract with F.C. Cycles. (Paper No. 140; memorandum in support of plaintiff's motion at 20).

■■■ "There is no cause of action for interference with a contract when suit is brought against a party to the contract. It is widely recognized that one cannot be liable for tortious interference with his own contract." *Pope v. Board of School Commissioners of Baltimore City,* 106 Md.App. 578, 591, 665 A.2d 713, 719 (1995), *cert. denied,* 342 Md. 116, 673 A.2d 707 (1996). To allow such a cause of action between contracting parties would permit a breach of contract action to escalate into the tort arena—a solution clearly not favored at law.

The plaintiff argues, however, that Fila Canada and Fila U.S.A. are not parties to the instant contract and thus the asserted cause of action survives. The Court is unconvinced.

In *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771–772, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Supreme Court held that a parent corporation was not legally capable of conspiring with its wholly owned subsidiary. This decision was based on a determination that entities that have a complete unity of interest are essentially the same entity and thus, are incapable of conspiring. The same unity of interest test is used to determine, on a case-by-case basis, whether closely related companies are capable of interfering with each other's contracts. *See Seabury Management, Inc. v. PGA of America,* 878 F.Supp. 771, 777–778 (D.Md. 1994), *aff'd in part, rev'd on other grounds,* 52 F.3d 322 (4th Cir.1995), *cert. denied,* 516

---

**11.** While this ruling also provides a basis for argument that waiver has been effected as to all subjects in the July 27 memorandum, F.C. Cycles

has wisely not so argued raising as it would relevancy questions.

U.S. 867, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995). *See also Oksanen v. Page Memorial Hosp.,* 945 F.2d 696, 703 (4th Cir.1991), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992) (*Copperweld* requires the application of a "functional approach" to the question of intracorporate immunity and holding that a hospital's board of trustees could not conspire with the hospital's medical staff); *Dee–K Enterprises, Inc. v. Heveafil Sdn. Bhd.,* 982 F.Supp. 1138, 1142 n. 6 (E.D.Va.1997) ("wholly owned distributors cannot conspire with their parent-manufacturers, they can legally conspire with other manufacturers and distributors. In other words, while the parent and subsidiary are treated as one entity under *Copperweld,* that does not preclude each such entity from conspiring to fix prices with other, unrelated entities"); *Williams v. 5300 Columbia Pike Corp.,* 891 F.Supp. 1169, 1174 (E.D.Va.1995).

■ The plaintiff does not contest that Fila Canada or Fila U.S.A. are anything other than wholly owned subsidiaries of Fila Sport or that there is a lack of unity of interest between them. Thus, the plaintiff has failed to establish prima facie evidence that Fila Canada and Fila U.S.A. are third parties to the contract allegedly interfered with. As pled, this is not a sufficient showing.

I find, therefore, that the "crime, fraud, tort" exception does not apply to the attorney client privilege that attached to the July 27, 1995 memorandum.

### D. Discovery of the Requested Documents is Relevant

The defendant's final argument is that the sought-after documents are not relevant to the instant litigation because the plaintiff is attempting to "inject into this case a claim that Fila Sport's termination of the Agreement was 'pretextual,' and not based on F.C. Cycles various contract breaches." (Paper 140; defendant's memorandum in opposition at 24). For support the defendant cites numerous authorities that are either factually dissimilar or are mischaracterized.

For example, the defendant relies on *Hinkleman v. Shell Oil Co.,* 962 F.2d 372 (4th Cir.), *cert. denied,* 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992) and *Murphy Oil USA, Inc. v. Brooks Hauser,* 820 F.Supp. 437 (1993) both of which concerned the undisputed nonpayment of a franchise fee and the resultant statutorily prescribed contract breach.[12] Thus, in both of aforementioned cases the breach was proven in the pleadings and the franchisee's claims of justifiable nonpayment were held to be irrelevant.

Similarly, the defendant relies on *Refinement International Co. v. Eastbourne N.V.,* 815 F.Supp. 738 (S.D.N.Y.1993), *aff'd,* 25 F.3d 105 (2d Cir.1994). There it was undisputed that the plaintiff did not pay the defendant a sum it was contractually obligated to pay. The plaintiff first asserted that its failure to pay was not a material breach of the contract. The court, relying on the plain language of the contract, rejected this assertion and held that the breach was material and, thus, the defendant's duty to perform was terminated. 815 F.Supp. at 741–742. Furthermore, the court rejected the plaintiff's pretext argument because the failure to pay gave the defendant the legal right to terminate its obligations under the plain language of the contract. *Id.* at 742.

In each of these three cases a party was under a contractual obligation to pay. In each of these three cases the party that failed to pay admitted in its pleadings that it did not pay the required sums. Such is not the case in the instant action.

Another case relied upon by the defendant, *Two Wheel Corp. v. American Honda Corp.,* 506 F.Supp. 806 (E.D.N.Y.), *aff'd,* 633 F.2d 206 (2d Cir.1980), actually supports the plaintiff's position. There, the court was asked to issue a preliminary injunction against the defendant's termination of the plaintiff's automobile franchise. The court acknowledged that if it found "it more likely than not that the defendant discontinued the plaintiff as a Honda dealer for cause, or that the propriety of the termination of the plaintiff's franchise does not present questions of a sufficient serious nature as to make them a fair ground for litigation, the defendant's motive becomes

---

12. *See* Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801 *et seq.*

**82**

irrelevant." *Id.* at 815. The court did *not* refuse to address the issue on the basis of relevance. Rather, it specifically addressed the issue of pretext and finding the plaintiff's assertions to be valid, granted the motion for a temporary injunction.

The defendant also asserts that *Richland Wholesale Liquors v. Glenmore Distilleries Co.,* 818 F.2d 312 (4th Cir.1987) stands the proposition that "the wholesaler's motive for termination did not present as jury question." (Paper 140; defendant's motion in opposition at 26). Judge Hall, writing for the court, actually stated that "the disputed testimony about motivation does not present a jury question *unless there is evidence of supplier behavior which is arguably arbitrary or malicious." Richland Wholesale Liquors,* 818 F.2d at 315 (emphasis added). It is precisely this type of evidence the plaintiff is seeking. That is, evidence of the defendant's arbitrary and malicious conduct.

Finally, Fila ignores that the permissible scope of discovery is broad and that the relevancy threshold for discovery is satisfied so long as the discovery sought is "germane to the subject matter of the pending action." *Ralston Purina Co. v. McFarland,* 550 F.2d 967, 973 (4th Cir.1977). In the instant action the sought after documents and their subject matter are germane to this controversy. As noted above, the defendant's motivation is a central issue in this controversy and is relevant if its behavior "is arguably arbitrary or malicious." *Richland Wholesale Liquors,* 818 F.2d at 315.

### Conclusion

For the foregoing reasons, plaintiff's Motion to Compel Production of Allegedly Privileged Documents and Deposition Testimony From Defendant Fila Sport, S.p.A. is granted. A separate order shall issue.

